UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

HUDSON FURNITURE, INC., and BARLAS BAYLAR,

                    *Plaintiffs,*

    *-against-*

ALAN MIZRAHI d/b/a/ ALAN MIZRAHI LIGHTING,
and LIGHTING DESIGN WHOLESALERS, INC.

                *Defendants.*

-----------------------------------------------------------X

1:20 Civ. 04891 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Plaintiffs Hudson Furniture, Inc. ("Hudson") and Barlas Baylar (collectively, "Plaintiffs") commenced this action to limit the use of Plaintiffs' design patents, trademarks, copyrighted images, and Baylar's name and image by Defendants, Alan Mizrahi and Lighting Design Wholesalers, Inc. (collectively, "Defendants"). Plaintiffs' complaint alleges the following: patent infringement in violation of 35 U.S.C. § 289 (Counts I–VI); trademark infringement pursuant to Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), and unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count VII); trademark infringement, unfair competition, and misappropriation under New York common law (Count VIII); use of name with intent to deceive in violation of New York General Business Law § 133 (Count IX); injury to business reputation and dilution in violation of New York General Business Law § 360-l (Count X); copyright infringement pursuant to 17 U.S.C. § 101 (Count XI); and unauthorized use of name and image in violation of §§ 50 and 51 of the New York Civil Rights

Law. Plaintiffs now move for partial summary judgment on their trademark, copyright, and state law claims pursuant to Rule 56 of the Federal Rules of Civil Procedure (Counts VII–XII). Plaintiffs additionally move for sanctions against Defendants for noncompliance with an order to produce discovery and this Court's preliminary injunction.

The Court **GRANTS IN PART** Plaintiffs' motion for copyright infringement (Count XI), finding Defendants liable for willful infringement of Plaintiffs' copyrights works, but denying summary judgment on damages related to Plaintiffs' 2019 catalog. In all other respects, Plaintiffs' motions for partial summary judgment (Counts VII–XII) and sanctions are **GRANTED.**

## BACKGROUND

Plaintiff, Hudson Furniture, Inc., is a New York manufacturer, designer and retailer of lighting designs and furniture products that was formed in 2004. Pls.' Rule 56.1 Statement of Facts ("Pls.' SOF") ¶ 1, ECF No. 139. Hudson promotes its lighting designs through its website, online and printed catalogs, social media, interior design publications, and through contractors, architects, and interior designers. Baylar Decl. ¶ 12, ECF No. 134. Plaintiff, Barlas Baylar, is the Chief Executive Officer and Creative Director of Hudson Furniture. Pls.' SOF ¶ 2.

Hudson asserts that it owns three types of intellectual property rights relevant to this dispute. First, Hudson owns several registered trademarks, including HUDSON FURNITURE and BARLAS BAYLAR (the "Hudson Registered Marks").[1] Pls.' SOF ¶ 8. Second, Hudson uses unregistered trademarks for each of its lighting designs, including MOTHER, PANGEA, LA CAGE, BRITANCIA, VALIANT, PANTHEON, TUSK, and LOTUS (the "Hudson Unregistered

---

[1] Hudson's three registered trademarks are: HUDSON FURNITURE, Registration No. 4, 597, 499 in International Class 11 for lighting fixtures; HUDSON FURNITURE, Registration No. 4, 046, 353 in International Classes 20 and 35 covering furniture and retail store services featuring furniture respectively; and BARLAS BAYLAR, Registration No. 4, 403, 798 in International Class 11 for lighting fixtures. Pls.' SOF ¶ 8.

Marks"). Pls.' SOF ¶ 11. Third, Hudson owns several copyright registrations (collectively, the "Hudson Copyrights") for its catalogs and websites, including the photographs and copy contained therein.[2] Pls.' SOF ¶¶ 16–19. Hudson did not, and has never, transferred or licensed any rights to Defendants to use the Hudson Registered Marks, Hudson Unregistered Marks, Hudson Copyrights, or Baylar's likeness. Pls.' SOF ¶¶ 12, 17.

Mizrahi works under the names Lighting Design Wholesalers, Inc., Alan Mizrahi Lighting Design and Alan Mizrahi Lighting and manages or controls several online platforms (the "Mizrahi Websites") in furtherance of his business.[3] Pls.' SOF ¶¶ 5, 23–32; Mizrahi Decl. ¶ 2. Mizrahi sells furniture and lighting via the Mizrahi Websites. Mizrahi Decl. ¶ 3.

Hudson regularly monitors internet activity to look for vendors selling knockoffs of its products. Baylar Decl. ¶ 23. In the course of this monitoring, Hudson discovered that the Mizrahi Websites were posting its copyrighted photographs to sell products bearing the Hudson Unregistered and Registered Marks (the "Hudson Marks"). *Id.* ¶¶ 23–24. For example, pictured below on the left is Hudson's copyrighted photo of its fixture bearing the LA CAGE mark, and on the right is the same photo captured from <alanmizrahilighting.net>. *Id.* ¶ 25.

---

[2] Hudson's four copyright registrations are: Hudson Furniture 1/31/2012, Registration No. VA0001862678; Hudson Furniture 2/7/2014, Registration No. VA0001908807; Hudson Furniture 9/4/2015, Registration No. VA0001984811; Hudson Furniture Catalog 2019, Registration No. VA0002203849. Pls.' SOF ¶ 19.

[3] Mizrahi manages or controls the websites located at: www.alanmizrahi.net, www.alanmizrahilighting.net, <alan-mizrahi-lighting.myshopify.com>, <meylah.com/alanmizrahilightingdesigns>. Pls.' SOF ¶¶ 23–27. Mizrahi also controls the Instagram account  and the Alan Mizrahi Lighting Design Pinterest page. Pls.' SOF ¶ 28. Additionally, Mizrahi previously owned and controlled the websites hosted at <www.alanmizrahi.com> and <www.alanmizrahilighting.com> which were nearly identical to the Mizrahi Websites. Pls.' SOF ¶ 30.





| Copyright Registration No.: VA 1-908-807 2014 catalog | Source: https://alanmizrahilighting.net/image/cac he/data/chain/jk078_la_cage_round/jk07 |
| --- | --- |

Plaintiffs claim that the Mizrahi Websites create a fictitious association with Hudson and confuse consumers about the origin sponsorship, or endorsement of Defendants' products. Baylar Decl. ¶ 27. Indeed, the Mizrahi Websites often characterize Defendants as the designer and manufacturer of the Hudson Products. For example, Defendants' myshopify.com account used Hudson's copyrighted photographs to offer a fixture bearing the BRITANICA mark for sale. *See* Hines Decl. Ex. 11, at 4. The accompanying description reads "[h]aving created custom chandeliers for over three decades, we specialize in bringing lighting concepts into reality . . . . Let us create the perfect lighting fixtures for your individual needs, to your individual specifications, and with attention to detail throughout production." *Id.* In other instances, Defendants use the Hudson Registered Marks, and include photographs of Baylar himself, claiming that the products are designed by HUDSON FURNITURE and/or BARLAS BAYLAR. Pls.' SOF ¶ 27. Hudson does not and has never sold its products through Defendants, nor has it

ever licensed or given consent for Defendants to use any of Hudson's copyrighted images or marks. *Id.* ¶¶ 28–29.

At the time Hudson became aware of the Mizrahi Websites, it also discovered that a third-party, Jennifer Welch Designs, posted what appeared to be a Valiant chandelier on its social media account. *Id.* ¶ 30. After an internal investigation, Hudson determined it never sold any Valiant chandeliers to Defendants or to Jennifer Welch Designs. Baylar Decl. ¶¶ 30–32. Welch produced discovery showing that in 2019 she purchased what appeared to be a Valiant chandelier directly from Defendants. Welch Decl. ¶¶ 4–11, Exs. 1–6, ECF No. 136. Based on the Mizrahi Websites and the Welch purchase, Plaintiffs determined that Defendants were selling unauthorized reproductions of Hudson's lighting fixtures.

On June 25, 2020, Plaintiffs filed a complaint in this action, alleging that Defendants advertise and sell 'knockoffs' of its products, causing them to suffer (1) lost sales and (2) damage to their reputation for quality. *Hudson Furniture, Inc. v. Mizrahi*, 20-cv-4891, 2020 WL 5202118, at *2–3 (S.D.N.Y. Sept. 1, 2020). Specifically, Hudson alleges Mizrahi used copyrighted images of Hudson's products and displayed them on Mizrahi's websites deceiving consumers into thinking that Hudson is the source of the offending products. *Id.* at *2. On June 26, 2020, Plaintiffs filed a motion for a preliminary injunction. *Id.* On September 1, 2020, this Court granted the preliminary injunction in part enjoining Defendants' use of Plaintiffs' copyrights and trademarks. *Id.* at 7.

## DISCUSSION

### I.    Legal Standard

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Otto v. Hearst Communications, Inc.*, 345 F.Supp.3d 412, 422–23 (S.D.N.Y., 2018) (quoting *Anderson*, 477 U.S. at 248). The court must view the record in the light most favorable to the non-moving party and must draw all reasonable inferences in its favor. *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Otto*, 345 F.Supp.3d at 423 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). The non-moving party cannot rely on conclusory allegations or unsubstantiated speculations, but rather must provide specific citations to the record in order to show the existence of a genuine factual issue. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

## II.   Analysis

### A. Federal Trademark Infringement

Plaintiffs seventh cause of action alleges trademark infringement, false designation of origin, and unfair competition under Section 32 and Section 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a).

Section 32(1)(a) of the Lanham Act protects registered trademarks and imposes civil liability on any person who, "without the consent of the registrant, 'use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with

which such use is likely to cause confusion.'" *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 435 (S.D.N.Y. 2020) (quoting 15 U.S.C. § 1114(1)(a)).  Section 43(a) of the Lanham Act protects unregistered trademarks from infringement by prohibiting "any person from using in commerce, in connection with any goods, 'any word, term, name, symbol, or device, or any combination thereof which is likely to cause confusion, or to cause mistake, or to deceive as to the origin, scholarship, or approval of his or her goods by another person.'" *Now-Casting Economics, Ltd. v. Economic Alchemy LLC*, -- F. Supp. 3d --, 2022 WL 4280403, at *8 (S.D.N.Y. Sept. 15, 2022) (quoting 15 U.S.C. §1125(a)).

The legal standard to establish liability for trademark infringement and false association are the same.  *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 62 (2d Cir. 2000).  For plaintiffs to prevail, they must demonstrate (1) that the marks at issue are entitled to protection; and (2) the defendant's use of the marks are likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods.  *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995).

### 1. Plaintiffs' Marks Are Entitled to Protection

The Court easily finds the Hudson Registered Marks are entitled to protection.  "A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).  It is undisputed that the Hudson Registered Marks are subject to valid trademarks.  Defs.' Resp. Pls.' Rule 56.1 Statement of Facts ("Defs.' SOF") ¶ 8, ECF No. 153. Therefore, the Hudson Registered Marks are entitled to protection.

The Court likewise finds that the Hudson Unregistered Marks are entitled to protection. "For an unregistered mark to be protectable under §1125(a), 'the mark must be sufficiently distinctive to distinguish the registrant's goods from those of others.'" *Now-Casting Econ*, 628 F. Supp. 3d at 516 (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006)). "The degree to which a mark is entitled to protection under the Act depends on whether the mark is classified as (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary." *Id.* "A generic term can never be a valid trademark (and can never be registered). A descriptive term can be protected only if it has acquired secondary meaning. Suggestive, arbitrary or fanciful marks may be protected without a showing of secondary meaning." *Arrow Fastener*, 59 F.3d at 391.

The Unregistered Marks are entitled to protection because they are arbitrary marks. "An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product." *Id.* In other words, the meaning of the mark is arbitrarily assigned to the product. Here, each Unregistered Mark— MOTHER, PANGEA, LA CAGE, BRITANICA, VALIANT, PANTHEON, TUSK, and LOTUS—has an actual dictionary definition, and none of these words literally describes a chandelier or lighting fixture. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003) (finding a mark arbitrary because "the word 'virgin' has no intrinsic relationship whatsoever to selling [electronic] equipment"). Because arbitrary marks are inherently distinct, the Unregistered Marks are entitled to protection. *See id.* (noting that "the law accords broad, muscular protection to marks that are arbitrary or fanciful in relation to the products on which they are used").

Defendants contend that Plaintiffs have not met their burden in proving that the Unregistered Marks are valid and entitled to protection. Specifically, Defendants allege that

Plaintiffs have not provided any evidence to prove that the marks are distinctive or have secondary meaning. Defs.' Mem. Opp'n ("Defs.' Mem.") 3–5, ECF No. 151. This argument is meritless because the Unregistered Marks are arbitrary, not descriptive, and therefore Plaintiffs do not need to prove secondary meaning. *Arrow Fastener*, 59 F.3d at 391 ("Suggestive, arbitrary or fanciful marks may be protected without a showing of secondary meaning.").

       2.  Consumer Confusion

The Court now turns to the question of consumer confusion. "Courts in this Circuit apply the eight-factor balancing test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961), to determine whether an alleged infringement is likely to cause confusion." *Chanel*, 449 F. Supp. 3d at 436. The *Polaroid* factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016). "The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Id.* "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383–84 (2d Cir. 2005).

       *a.*    *Strength of the Hudson Marks*

"The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis. There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace ["acquired distinctiveness"]." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 130–31 (2d Cir. 2004) (citations omitted). Inherent distinctiveness "distinguishes between, on the one hand, inherently distinctive marks—marks that are arbitrary or fanciful in relation to the products (or services) on which they are used—and, on the other hand, marks that are generic, descriptive or suggestive as to those goods. The former are the strong marks." *Virgin Enterprises*, 335 F.3d at 147. Acquired distinctiveness refers to "fame, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition." *Id.*

The Hudson Marks are strong. The Registered Marks are descriptive in nature and are therefore not inherently distinct. The Unregistered Marks, however, are arbitrary and are therefore inherently distinct. On the acquired distinctiveness factor, Plaintiffs have provided ample evidence showing that Hudson's Marks (both Registered and Unregistered) have been highly publicized since its founding in 2004 and have developed a reputation for their uniqueness and innovativeness. Baylar Decl. ¶ 7, Ex. 1. Hudson's pieces have been featured in well-recognized architectural and interior design magazines, including Architectural Digest, The World of Interiors, T Magazine, Luxe Interiors and Design, House Beautiful, Boston Home, Colorado Homes & Lifestyles, Interior Design, and W Magazine. Pls.' SOF ¶ 20. Given the inherent distinctiveness of the Unregistered Marks, and the renown of Hudson's products generally, there is a strong indication that copying the Hudson Marks would lead to confusion.

> b.      *Similarity of the Two Marks*

The Marks at issue are identical. It is uncontested that Defendants used Hudson's Marks on the Mizrahi Websites. Pls.' SOF ¶¶ 36–52. Where the defendant uses the same mark as the plaintiff's, consumer confusion weighs in favor of the plaintiff. *Virgin Enterprises*, 335 F.3d at 149 ("In view of the fact that defendants used the same name as plaintiff, we conclude the defendants' mark was sufficiently similar to plaintiff's to increase the likelihood of confusion.). Accordingly, because the marks are identical, there is a strong probability of confusion.

       *c.*     *The Proximity of the Goods*

"This factor is concerned with the competitive distance between the products." *Arrow Fastener*, 59 F.3d at 396. "Where the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source." *Virgin Enterprises*, 335 F.3d at 147. However, where the marks occupy the same market, it becomes "more likely that the consumer will mistakenly assume a common source." *Id.*

Here, Defendants' use identical marks to sell an identical category of goods. "Given the clear subject-matter relationship of Defendant[s'] [goods] to Plaintiff[s'] commerce, there is every reason to believe that persons familiar with Plaintiff[s'] trademark, who view Defendant[s'] trademark, are likely to assume that Defendant[s] and Plaintiff[s] are related entities." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 40 (2d Cir. 2016). Moreover, both parties offer the identical lighting fixtures to customers throughout the United States via their websites, supporting a finding of geographic proximity. *See id.* (finding geographic proximity where both parties offer services nationwide "through the Internet"). Therefore, competitive proximity favors a likelihood of confusion.

       *d.*     *Likelihood of Bridging the Gap*

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.*, 412 F.3d at 387. Where the products are "already in competitive proximity, there is really no gap to bridge." *Id.* Here, because the products directly compete within the same market, "this factor is irrelevant to the *Polaroid* analysis." *Id.*

        e.      *Actual Confusion*

"It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004) (alterations omitted). Nevertheless, "there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Id.*

"Evidence of actual confusion may consist of anecdotal or survey evidence." *Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co.*, 15-cv-10154, 2022 WL 17851810, at *43 (S.D.N.Y. Dec. 22, 2022). "To be germane under the Lanham Act, the confusion must be of a type that 'could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.'" *Id.* (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991)). Limited instances of actual confusion do "not go far toward demonstrating that an 'appreciable number of ordinarily prudent purchasers' are likely to be confused.'" *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 674 (S.D.N.Y. 2016) (quoting *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 524 (S.D.N.Y. 2008)).

Here, Plaintiffs offered evidence of only one instance of actual confusion involving non-party Jennifer Welch Designs, an interior design firm based in Oklahoma City, Oklahoma. On this occasion, Welch purchased what appeared to be a Valiant chandelier directly from Defendants.

-12-

Welch Decl. Ex. 3–6.   Welch's purchase demonstrates that Mizrahi's infringement had the potential to "inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang* 949 F.2d at 583.   This is underscored by the fact that Welch is an interior designer connected to many potential buyers interested in light fixtures. *See De Venustas v. Venustas Int'l, LLC*, 07-cv-4530, 2007 WL 2597122, at *6 (S.D.N.Y. Sept. 11, 2007) (finding actual confusion where "people who called . . . were fashion and beauty field insiders, and thus are important potential sources of referrals").   However, this single instance of actual confusion is not sufficient to establish that "an appreciable number of ordinarily prudent purchasers" are likely to be confused. *LVL XIII Brands*, 209 F. Supp. 3d at 674.   Accordingly, this factor weighs slightly in Defendants' favor.

f.      *Defendant's Good Faith*

"The inquiry into willfulness or bad faith 'considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp.*, 391 F.3d at 460).   "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Focus Prod.*, 2022 WL 17851810, at *44. "In determining a defendant's intent, 'actual or constructive knowledge' of the prior user's mark or dress may indicate bad faith.   Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith." *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 587 (2d Cir. 1993) (quoting *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987)).

Here, Defendants' bad faith is clear.  They copied Hudson's Marks and copyrighted photographs to sell their own lighting products.  The Marks and images Mizrahi used were identical to Hudson's. *See e.g.*, Pls.' SOF ¶¶ 34–35. Further, Defendants admit to superimposing Mizrahi's branding on copyrighted images of Hudson's products.  Hines Decl. Ex. 6 ("Mizrahi Dep.") 184–87; Hines Decl. Exs. 11, 19.   Such similarities make "plain that deliberate copying has occurred" and evince that Mizrahi intended to conceal the origin and sponsorship of his goods to capitalize on Hudson's good will. *Paddington Corp.*, 996 F.2d at 587.

Defendants claim they never intended to cause confusion, but only desired to "identify to the customer who the manufacturer was." Defs.' Mem. 10.  In Mizrahi's declaration, he states that "as a wholesaler, I simply display pictures of the products on my website, but I do not brand them or claim to have designed them."  Mizrahi Decl. ¶ 14, ECF No. 150; *see also* Defs.' Mem. 10 ("Nowhere on this page does the Mizrahi website indicate that it was the manufacturer of the products.  Defendants [sic] webpage functions—as does the Amazon online storefront—as a host.").  Mizrahi's website tells a different story.  Defendants' "About Us" page claims that

> Alan Mizrahi Lighting designs are manufactured with the best Crystal available . . . . Alan Mizrahi Lighting is developing new designs almost on a daily base [sic] . . . . Alan Mizrahi Lighting is not only manufacturing their own design but also working close to the architects and interior designers . . . . It goes without saying that we are also able to design and produce chandeliers in every classical or Arabian style.

Hines Decl. Ex. 23. By representing themselves as both a designer and manufacturer, Defendants' have deliberately created confusion as to the origin and sponsorship of their goods.  As such, the Court finds as a matter of law that Defendants' replication of Hudson's mark was in bad faith and manifested an intention to create a confusing similarity between the products.

       g.     *Quality of Defendants' Products*

Neither party addresses the quality of Defendants' products. Therefore, the Court finds this element to be neutral in this case.

### h.   Sophistication of the Consumers

"The degree of sophistication of consumers can have an important bearing on likelihood of confusion. Where the purchasers of a products [sic] are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks." *Virgin Enterprises,* 335 F.3d at 151. "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be." *Focus Prod.*, 2022 WL 17851810, at *46. Plaintiffs do not address this element in their briefs. Defendants state at various times that the "end users of his website are sophisticated users, mostly interior designers." Defs.' Mem. 10–11. Moreover, the lighting fixtures are not cheap. Accordingly, the Court finds this element favors Defendants.

### i.   Balancing the factors

The "evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020). While no single factor is dispositive, "the Second Circuit has explained that strength, similarity, and proximity are generally the three most important *Polaroid* factors." *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*, 7 F. Supp. 3d 385, 399 (S.D.N.Y. 2014).

Weighing the factors as a whole, the Court finds that the Defendants' use of the Hudson Marks is likely to cause consumer confusion. The three critical factors—strength, similarity, and proximity—all favor Plaintiffs. Defendants copied Hudson's Marks and used them to sell their

own competing lighting products on their websites. This fact alone demonstrates a likeliness of confusion. *See Topps Co. Inc. v. Gerrit J. Verburg Co.*, 96-cv-7302, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996) ("Where the marks are identical, and the goods are also identical and directly competitive, the decision can be made directly without a more formal and complete discussion of all of the *Polaroid* factors."). Moreover, the Defendants pursued this course of action intentionally, piggybacking on Hudson's reputation and goodwill. The remaining factors—actual confusion, sophistication, and quality—are generally neutral, and to the extent they favor Defendants, it is not enough to refute the overwhelming likelihood that Defendants' actions would cause confusion. Having found that Hudson's Marks are entitled to protection, and that Plaintiffs' have shown the requisite likelihood of confusion, the Court holds that Defendants infringed on the Hudson Marks.

### 3. Defendants' Fair Use Defense

Plaintiffs seek summary judgment on Defendants' fair use defense. "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'" *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30 (2d Cir.1993)). The Court finds that there is no evidence to support Defendants' fair use defense, such that Plaintiffs are entitled to a judgment as a matter of law.

Defendants assert a classic fair use defense. "Classic" fair use allows for a junior user to use another's mark "to describe the *defendant's* goods or services, or their geographic origin, or to name the person involved in running the business." 2 McCarthy on Trademarks and Unfair

Competition ["McCarthy"] § 11:45 (5th ed.) (emphasis added); *see also* 15 U.S.C. § 1115(b)(4). Here, Defendants claim they use the Hudson Marks to describe *Plaintiffs'* goods, which they insist are the only goods they sell. As classic fair use concerns using another's Mark to describe one's own goods, their reliance on the defense is inapt.

Even crediting Defendants' classic fair use argument, it would fail. To prevail using the classic fair use defense, "a defendant must prove three elements: that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). Defendants fail on all three factors. First, Defendants clearly used the Hudson Marks "as a symbol to attract public attention" and therefore used them as marks. *See Kelly-Brown*, 717 F.3d at 308. Second, the Hudson Marks were not used in a "descriptive sense" as they were "specifically designed to evoke in consumers' minds" Hudson's Marks "in an effort to trade on their popularity and goodwill." *Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413, 431 (S.D.N.Y. 2018). Third, as discussed *supra*, Defendants were acting in bad faith.

Defendants' argument more closely resembles nominative fair use, but even crediting an argument Defendants do not make, the argument fails. Nominative fair use allows for the "use of another's trademark to identify, not the defendant's goods or services, but the *plaintiff's* goods or services." *Int'l Info. Sys. Sec. Certification Consortium*, 823 F.3d at 165 (quoting McCarthy § 23:11) (emphasis added). "The doctrine of nominative fair use allows a defendant to use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of the defendant's product or the mark-holder's sponsorship or affiliation." *Id.*

As a threshold matter, Defendants have not shown they sell Plaintiffs' goods. Plainitffs' have averred that they have never sold any products to Mizrahi. Pls.' SOF ¶ 50. This fact is underscored by the fact that Welch purchased a chandelier bearing Hudson's VALIANT mark

directly from Mizrahi, Welch Decl. ¶ 8, Ex. 3, but Plaintiffs' have no record of selling this item to either Defendants or Welch. Gharibian Decl. ¶ 5. To create a genuine issue of material fact, Mizrahi "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

Mizrahi has adduced no evidence to demonstrate that he sold genuine Hudson goods. In his declaration, Mizrahi claims that "anything I sell is purchased directly from the manufacturer." Mizrahi Decl. ¶ 8. To support this claim, Defendants point to several communications between itself and Plaintiffs purporting to show Mizrahi purchased products from Hudson. Mizrahi Decl. ¶ 10, Ex. 1. However, these communications do not reveal a single purchase from Hudson. On the contrary, they show many solicitations for price quotations and product specifications. Conspicuously absent are any orders, payment records, invoices, or shipping receipts. In short, Defendants offer no "hard evidence" that they have ever purchased a single item from Hudson. *Jeffreys*, 426 F.3d at 554.

Defendants have likewise failed to create a genuine issue of material fact regarding the Welch transaction. In an attempt to meet their burden, they point to inconsistencies in the product listing on its website and the accompanying receipt and shipping invoice. Mizrahi Decl. ¶ 18. For example, they emphasize the fact that the product on the website is priced at $11,850, while the receipt is for $5,033.70.[4] Welch Decl. Ex. 3. Similarly, the invoice Welch produced appears to be from nine months after the alleged transaction, and states that it is for 20 custom shades for $500. Welch Decl. Ex. 4.

---

[4] This discrepancy is easily resolved because the fixture listed on Mizrahi's website is priced for a 52" item, Welch Decl. Ex. 1, and Welch specifically inquired about purchasing an item of a different size. *Id.* Ex. 2.

To the extent these facts are inconsistent with Welch's declaration, they do not raise a triable issue of fact. What the Welch exhibits unequivocally show is that: (1) Welch inquired about purchasing a Valiant chandelier on March 26, 2019; (2) Welch remitted payment of $5,033.70 on April 25, 2019; (3) Defendants emailed Welch on April 25, 2019 stating "we received your order today" and confirmed she wanted "the glass combined with frosted white and shiny white glass, exactly like the image #6"; and (4) Welch received what appeared to be a Valiant chandelier and posted a picture of the item on Instagram. Welch Decl. Exs. 2–6. Mizrahi does not deny that Welch paid Defendants for something, nor does he deny that the emails make specific reference to a Valiant chandelier. *See* Mizrahi Decl. To create a triable issue of fact, he must come forward with some evidence demonstrating he sold a genuine Hudson product. But the most Defendants' offer is "I do not know where she got the picture of the lighting which she posted on her Instagram page."[5]  Mizrahi Decl. ¶ 20. This is precisely the type of "metaphysical doubt" which is insufficient to raise a triable issue of fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Accordingly, this issue must be resolved in Plaintiffs' favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

Moreover, even assuming Defendants sold Plaintiffs' goods, a claim which lacks any support, there is ample evidence that Defendants' conduct would not constitute nominative fair use. The Second Circuit has held that in nominative fair use cases, courts must address "whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or

---

[5] The Court further notes that the emails between Welch and Defendants twice include the word "valiant" and include the email address "alan.alanmizrahi@gmail.com," but were never produced by Defendants in discovery. Defendants may not create a triable issue of fact by flouting their discovery obligations.

endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services." *Int'l Info. Sys. Sec. Certification Consortium*, 823 F.3d at 168. Here, as discussed above, Defendants' online stores represent Mizrahi as the designer and manufacturer of the fixtures. *See* Hines Decl. Ex. 23, Ex. 43 at 40. These representations fail to reflect "the true or accurate relationship between plaintiff's and defendant's products." *Int'l Info. Sys. Sec. Certification Consortium*, 823 F.3d at 168. As such, because Defendants have "impl[ied] a false affiliation or endorsement by the plaintiff of the defendant," their use of Plaintiffs' Marks is not nominative fair use. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102–03 (2d Cir. 2010).

In accordance with the above, Plaintiffs' motion for summary judgment on its trademark infringement, false designation of origin, and unfair competition under Section 32 and Section 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a) is granted.

### B. State Law Claims

1. Common Law Trademark Infringement, Unfair Competition, and Misappropriation

"Plaintiffs' claim of common law trademark infringement requires them to meet the same elements as their Lanham Act claims, with a similar emphasis on the likelihood of confusion." *Nike, Inc. v. Top Brand Co.*, 00-cv-8179, 2005 WL 1654859, at *7 (S.D.N.Y. July 13, 2005). As discussed above, Defendants' use of the Plaintiffs' Marks was likely to cause confusion. Accordingly, the Court grants summary judgment against Defendants on the issue of liability on Plaintiffs' common law trademark infringement claim.

"The same standards that govern a Lanham Act claim apply to a claim of unfair competition under New York common law, 'except common law requires a showing of bad faith or intent.'" *Chanel*, 449 F. Supp. 3d at 446 (quoting *BBK Tobacco & Foods, LLP*, 408 F. Supp. 3d at 522).

"There is a presumption that a defendant who willfully copied a plaintiff's mark acted in bad faith." *Nike*, 2005 WL 1654859 at \*8. Here, there is no dispute that Defendants intentionally copied the Hudson marks. Thus, the Court grants summary judgment on the issue of liability under common law unfair competition.[6]

### 2. Use of Name with Intent to Deceive under N.Y. Gen. Bus. Law § 133

New York General Business Law § 133 prohibits the adoption, with intent to deceive the public, of "any name . . . which may deceive or mislead the public as to the identity of such person, firm or corporation or as to the connection of such person, firm or corporation with any other person, firm or corporation." *Heritage of Pride, Inc. v. Matinee NYC, Inc.*, 14-cv-4165, 2014 WL 12783866, at \*16 (S.D.N.Y. June 20, 2014). "To prevail under § 133, a plaintiff must show that the defendant (1) used someone else's mark, and (2) acted in bad faith to deceive the public." *Id.* Having found that the Defendants used Hudson's Marks in bad faith, the Court grants summary judgment on the issue of liability under N.Y. Gen. Bus. L. § 133.

### 3. Dilution under N.Y. Gen. Bus. Law § 360-l

New York law provides that, in cases of infringement or unfair competition, a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y. Gen. Bus. Law § 360-l. Section 360-l "requires plaintiff to prove (1) that it possesses a strong mark—one which has a distinctive quality or has acquired a secondary meaning . . . and (2) a likelihood of dilution by either blurring or tarnishment." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83,

---

[6] While Plaintiffs allege common law misappropriation in the complaint, they do not address it in the motion for partial summary judgment. Therefore, to the extent Plaintiffs seek summary judgment as to the misappropriation claim, it is denied.

185 (S.D.N.Y. 2022) (quoting *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 330 (E.D.N.Y. 2021) (internal quotation marks omitted)).

With respect to the first factor—the strength of the mark—"distinctiveness for the purpose of trademark dilution claims under New York state law 'has been equated with the strength of a mark for infringement purposes.'" *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 328 (S.D.N.Y. 2015) (quoting *Johnson & Johnson Consumer Cos. v. Aini*, 540 F.Supp.2d 374, 394 (E.D.N.Y.2008)).   As discussed above, Plaintiffs' Marks are strong, both for their inherent distinctiveness and for their renown in the industry.

Regarding the second factor—likelihood of dilution—"[c]ourts in the Second Circuit consider six factors to determine dilution by blurring under New York law: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *Id.* (quoting *George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 651 (S.D.N.Y. 2014)).   "But again, those factors are only guideposts: The ultimate question under New York law is whether there is a likelihood that the capacity of the senior owner's mark 'to serve as a unique identifier of its source' will be diminished. *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 459 (S.D.N.Y. 2017) (quoting *Louis Vuitton Malletier*, 561 F.Supp.2d at 393).

The first five factors resemble the *Polaroid* factors already discussed, so the Court will not rehearse them again. *See id.* at 460.   The sixth factor, "the renown of the junior mark" is the possibility that "a junior mark may become so famous that it will overwhelm the senior mark." *Enchante Accessories, Inc. v. Turko Textile, LLC*, 19-cv-981, 2022 WL 4181791, at *2 (S.D.N.Y. Sept. 12, 2022).   Plaintiffs have adduced no evidence to this effect, so this element favors Defendants.   Regardless, looking to the factors as a whole, there is a substantial likelihood that

Hudson's ability to use its Marks as a unique identifier of its products will be impaired by Defendants' repeated use of the identical Marks and its misrepresentations that it manufactures and designs the products. Thus, the Court determines that there is a likelihood of blurring and grants Plaintiffs' motion for summary judgment with respect to its state law dilution claim.

### 4. Right to Publicity

"In New York, the right to privacy and corresponding right of publicity are both set forth in sections 50 and 51 of the New York Civil Rights Law." *Jackson v. Odenat*, 9 F. Supp. 3d 342, 352–53 (S.D.N.Y. 2014). "A successful right of publicity claim must show '(1) use of plaintiff's name, portrait, picture or voice (2) for advertising purposes or for the purposes of trade (3) without consent and (4) within the state of New York.'" *Id.* (quoting *Hoepker v. Kruger*, 200 F.Supp.2d 340, 348 (S.D.N.Y. 2002). All four factors clearly favor Plaintiffs. There is no dispute that Defendants, without authorization, used Baylar's photograph and name on their websites. Baylar Decl. ¶ 27, Ex. 1; *see also Jackson*, 9 F. Supp. 3d at 353 ("summary judgment is appropriate . . . where the person in the photograph is identifiable by someone familiar with him."). There is also little dispute that the Mizrahi Websites were accessible in New York., as Lighting Design Wholesalers is a New York Corporation.

Thus, all that remains is whether Defendants used Baylar's photograph and name for advertising purposes. Mizrahi states that he used Baylar's name to credit him as the manufacturer of the lighting photographs. Mizrahi Decl. ¶ 14. According to Defendants, Mizrahi uses a manufacturer's products, such as Hudson's lighting fixtures, to inspire interior designers and clients. Mizrahi Decl. ¶ 5. Even construing these facts in a light most favorable to Defendants, Mizrahi's sworn statement clearly evinces Defendants' use of Baylar's likeness to solicit customers. The Court thus finds Defendants' use of Plaintiffs' likeness to be for advertising

purposes.[7] Thus, Plaintiffs' motion for summary judgment on its New York Civil Rights claim is granted.

### C. Copyright Infringement

Turning to Plaintiffs' copyright infringement claims, the Court finds that the undisputed facts demonstrate Mizrahi's liability.

#### 1. Infringement

"The owner of a copyright has the exclusive right to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (quoting 17 U.S.C. § 106). "To establish infringement of copyright, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Id.* (quoting *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991)). "A certificate of registration from the United States Register of Copyrights constitutes *prima facie* evidence of the valid ownership of a copyright." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting 17 U.S.C. § 410(c)).

It is undisputed that Hudson owns several copyright registrations for their photographs and advertising material. Pls.' SOF ¶ 19. It is further undisputed that Hudson owns several valid

---

[7] Defendants argue that Hudson's use of the civil rights laws is preempted by Federal Copyright Law. Under § 301 of the Copyright Act, a state law claim is preempted by federal copyright law where (1) "the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act" and (2) "the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law." *Cabell v. Sony Pictures Ent., Inc.*, 714 F. Supp. 2d 452, 461 (S.D.N.Y. 2010). The Court rejects this argument. "Because Section 51 contains the additional element of use of one's image for advertising or trade purposes without written consent the nature of the action is nonequivalent and the doctrine of preemption does not apply to Section 51." *Passelaigue v. Getty Images (US), Inc.*, 16-cv-1362, 2018 WL 1156011, at *6 (S.D.N.Y. Mar. 1, 2018) (alterations omitted).

copyrights for photographs that appear on Mizrahi's Websites. Pls.' SOF ¶ 33–35. The Court thus turns to whether Plaintiffs established that this behavior was "unauthorized copying."

To establish unauthorized copying, a plaintiff must show that the defendant "(1) has actually copied the plaintiff's work and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiffs' work." *ID Tech LLC v. Bayam Grp., Inc.*, 19-cv-8439, 2023 WL 2688290, at *3 (S.D.N.Y. Mar. 29, 2023) (alteration omitted). "Actual copying may be established by direct or indirect evidence." *Jorgensen*, 351 F.3d at 51. "Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially 'by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying.'" *Id.* (quoting *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1249 (11th Cir.1999)). Where the works in question are "so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Id.* at 56.

Here, there is no question that Defendants used photographs that were identical to Plaintiffs. SOF ¶¶ 33–35. Pictured below is an example:

| | |
|---|---|
|  |  |
| Copyright Registration No.: VA 1-908-807<br>2014 catalog | Source:<br>https://alanmizrahilighting.net/image/cac<br>he/data/chain/wm125_tusk_ceiling/WM1<br>25_6-800x800-800x800.jpg (last accessed<br>June 11, 2020) |

Baylar Decl. ¶ 25.  Nor is there any doubt that there are substantial similarities between the works.

"The general test for determining substantial similarity is 'whether an average lay observer would

recognize the alleged copy as having been appropriated from the copyrighted work.'"  *Warner*

*Bros. Inc. v. Am. Broad. Cos., Inc.*, 654 F.2d 204, 208 (2d Cir. 1981) (quoting *Ideal Toy Corp. v.*

*Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966)).  Here, the works are not merely similar, but

identical.  *See BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 402

(S.D.N.Y. 2016) (finding substantial similarity where the photographs in question were identical).

Despite the obvious similarities between the photographs, Defendants point to a few

arbitrary distinctions between the works, such as the artsy and glossy nature of Plaintiffs'

catalogues compared to Defendants' "functional and utilitarian" website.  Defs.' Mem. 14.  These

distinctions are irrelevant.  The photographs are identical, and Defendants' degradation of the

quality of those photographs only serves to enhance Plaintiffs' copyright interest in their

"exclusive ability to control the quality and manner in which her work appears." *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 502 (S.D.N.Y. 2018).

Accordingly, because Plaintiffs owns valid copyrights to its images, and because the actual copying and substantial similarity elements have been met, the Court finds that Defendants infringed upon Plaintiffs' exclusive right to control the reproduction and distribution of its photographs.

> 2.   Fair Use

Plaintiffs seek summary judgment on Defendants' fair use defense. As discussed *supra*, on summary judgment, a plaintiff may challenge the legal sufficiency of an affirmative defense "by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'" *F.D.I.C.*, 34 F.3d at 54 (quoting *DiCola*, 996 F.2d at 30). As provided below, the Court finds that there is no evidence to support Defendants' fair use defense, such that Plaintiffs are entitled to a judgment as a matter of law.

Fair use is an affirmative defense to copyright infringement. It allows for the use of a copyrighted work for purposes including criticism, comment, news reporting, teaching, scholarship or research. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1261 (2023). To determine whether a use is "fair," the statute sets out four factors to consider:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* at 1273–74 (quoting 17 U.S.C. § 107). The Act's fair use provision "sets forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances." *Id.*

The first fair use factor—the purpose and character of the use—is "the heart of the fair use inquiry." *Otto*, 345 F. Supp. 3d at 427. This factor asks "whether and to what extent the new work is transformative." *Id.* "If the secondary use adds value to the original" for example by using the original "in the creation of new information, new aesthetics, new insights and understandings" then it is "the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Id.* In addition to looking at transformation, this factor assesses "whether the use was for a commercial purpose." *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 531 (S.D.N.Y. 2018). "[C]ommercialism weighs against a finding of fair use." *Id.*

Here, Defendants use is not transformative because Mizrahi simply used photographs from Hudson's websites to advertise on his own websites. Defendants' use was strictly commercial and added nothing. Defendants contend that by making the images smaller and posting them on their website, they transformed the work. Defs.' Mem. 14–15. They argue that "except for the image of the light there is no similarity." *Id.* at 15. The "image of the light" is the heart of the dispute, and there is no doubt it is the same. "Using a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair." *BWP Media USA*, 196 F. Supp. 3d at 407. Accordingly, there is no support that the nature and purpose of Mizrahi's use was fair.

With respect to the second element, the nature of the copyrighted work, "courts consider whether a work is creative versus factual, and unpublished versus published, with copyright protections applying more broadly to creative and unpublished works." *Id.* at 408. "Although photographs are often factual or informational in nature, the art of photography has generally been

deemed sufficiently creative to make the second fair use factor weigh in favor of photographer-plaintiffs." *Otto*, 345 F. Supp. at 430 (quotation omitted). "[A] photographer's 'efforts to create an aesthetically attractive, technically competent photograph,' even of as seemingly banal a subject as fishing gear for a catalog, have been held to be 'plainly creative expressions.'" *BWP Media USA*, 196 F. Supp. 3d at 408 (quoting *Strauss v. Hearst Corp.*, 85-cv-10017, 1988 WL 18932, at *5 (S.D.N.Y. Feb. 19, 1988)).

The Court finds that the second factor disfavors a finding of fair use because the photos are creative. As Defendants note, "Hudson's catalog is artsy and glossy like a magazine." Defs. Mem. 14. Indeed, the fixtures are staged and lit dramatically, often juxtaposed against stark black backgrounds to emphasize their ornate detail. Courts routinely find that such technical choices support a finding of creativity. *See BWP Media USA*, 196 F. Supp. 3d at 408 (collecting cases). On the other hand, the photographs were published by Hudson, which favors Defendants, but this fact alone does little to sway the analysis. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001) (noting that the "second statutory factor" is "rarely found to be determinative").

"The third factor, which looks at the 'amount and substantiality of the portion used in relation to the copyrighted work as a whole,' recognizes that fragmentary copying is more likely to have a transformative purpose than wholesale copying." *On Davis*, 246 F.3d at 175 (quoting 17 U.S.C. § 107(3)). Here, Defendants did little more than reproduce Plaintiffs' images on its website. Accordingly, this factor favors Plaintiffs. *See Golden v. Michael Grecco Prods., Inc.*, 524 F.Supp.3d 52, 63 (E.D.N.Y. 2021) ("Because Golden used the entire image, unaltered, this factor clearly favors Grecco.").

"The fourth and last fair use factor examines the effect of the use upon the potential market for or value of the copyrighted work." *Otto*, 345 F. Supp. 3d at 431. This factor is "concerned

with secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright holder." *Id.* "[T]here is a presumption of market harm 'when a commercial use amounts to mere duplication of the entirety of an original.'" *McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594, 609 (S.D.N.Y. 2020) (quoting *Campbell*, 510 U.S. at 591)). The presumption applies here, as Defendants' use was both commercial and a mere duplication. *See id.*

In sum, all the factors favor Plaintiffs. Defendants' use was nothing remotely close to "criticism, comment, news reporting, teaching . . . scholarship, or research." 17 U.S.C. § 107. It was wholesale copying for pecuniary gain. Plaintiffs' motion for summary judgment on the issue is granted.

## III.    Sanctions

Plaintiffs' have moved for sanctions against Defendants for willful noncompliance with an order to produce discovery, and noncompliance with a preliminary injunction order from the Court. Pls. Mem. L. Sup. Def. J. Sanctions ("Pls. Sanctions Mem."), ECF No. 138. Plaintiffs urge the court to impose default judgment for Plaintiffs under Rule 37 of the Federal Rules of Civil Procedure ("Rule 37"), payment of Plaintiffs' attorney fees under Rule 37, and payment of Plaintiffs' attorney fees under the Court's civil contempt powers. Having resolved Plaintiffs' motion for summary judgment on the merits, the Court will not address Plaintiffs' request for default judgment. For the foregoing reasons, Plaintiffs motion for attorneys' fees under Rule 37 and the Court's civil contempt powers is granted.

### A. Discovery Sanctions

"The discovery provisions of the Federal Rules of Procedure are designed to achieve disclosure of all the evidence relevant to the merits of a controversy." *Daval Steel Prods. v. M/V*

*Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991). "It is intended that this disclosure of evidence proceed at the initiative of the parties, free from the time-consuming and costly process of court intervention." *Id.* "When a party seeks to frustrate this design by disobeying discovery orders, thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate." *Id.*

Rule 37 "grants to a court broad discretionary authority to impose a sanction(s) upon a party to a litigation that has failed to meet its discovery obligations." *Jobe O. v. Pataki*, 03-cv-8331, 2007 WL 844707, at *3 (S.D.N.Y. Mar. 15, 2007). Rule 37(b) provides, in pertinent part, that if a party "fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). The Rule further provides that "the court *must order* the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

Due to Defendants' attempts to flout their discovery obligations, this Court has repeatedly ordered that it produce relevant documents. First, on January 21, 2021, after Defendants produced only 50 documents in response to Plaintiffs' initial request, Hines Let., ECF No. 78, this Court ordered that by January 29, 2021, "Defendants shall complete production of all responsive, non-privileged documents located after a reasonable search." Order, ECF No. 81. Despite this Order, Defendants continued to produce piecemeal discovery, prompting this Court again to order that "Defendant shall complete document production by October 11, 2021." Order, ECF No. 110. This Order specifically warned that "[f]ailure to do so may result in monetary or other sanctions." *Id.*

Despite this Court's orders, Defendants have failed to meet their discovery obligations. For example, non-party Jennifer Welch provided emails demonstrating she purchased a product

from Defendants bearing Plaintiffs' VALIANT mark.  *See* Welch Decl. Ex. 2.  These emails twice

include the word "valiant" and include the email address "alan.alanmizrahi@gmail.com."  Despite

their overwhelming relevance to this matter, Defendants never produced these emails.  Similarly,

Defendants produced financial information from a Shopify storefront.  Hines Decl. ¶ 31.  But over

a year after producing these records, Mizrahi admitted that he often took orders "manually" by

email and processed payments elsewhere.  Mizrahi Dep. 126–131.  Again, Defendants never

produced any evidence to this effect.  Moreover, at Mizrahi's deposition, he testified that he had

agreements with Hudson permitting him to sell Plaintiffs' products.  When asked why the

agreements had not been produced, Mizrahi said "I have to go back and look one by one each

document and see if I can provide you those."  *Id.* at 123.  This was more than five months after

the Court ordered Mizrahi to "complete document production by October 11, 2021" under threat

of "monetary or other sanctions."

Defendants do not specifically contest any of these instances.  They claim that they have

produced "over 4,000 pages of documents . . . because of Plaintiffs never-ending demands to

produce.  In these 4,000 pages of emails, and transactions the defendants failed to find a single

piece of evidence showing wrongdoing."  Defs. Op. Sanctions 7, ECF No. 152.  They do not

explain why they failed to produce the Welch emails, the other transaction records, or the purported

agreements with Hudson.  In fact, they do not make a single citation to the record.  They admit

that if the Court finds Mizrahi violated this Court's orders, an "award of legal fees" would be

"justified here."  *Id.* at 4.  The Court agrees.

As provided by Federal Rule of Civil Procedure 37(b)(2)(C), the Court orders that

Defendants "pay the reasonable expenses, including attorney's fees" caused by Defendants failure

to comply with this Court's orders to produce all responsive documents.

**B. Civil Contempt**

"[I]t is firmly established that 'the power to punish for contempts is inherent in all courts.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (quoting *Ex parte Robinson*, 19 Wall. 505, 510 (1874)). "The underlying concern" that gives rise to the contempt power is not "merely the disruption of court proceedings" but "the disobedience to the orders of the Judiciary." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798 (1987).

"A party may be held in civil contempt for failure to comply with a court order if '(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995)). "It need not be established that the violation was willful." *Id.* "The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." *Id.* at 657. "Such sanctions may not be imposed as a purely punitive measure." *Id.* However, "civil contempt is not a discretionary matter; if a court order has been violated, the court must make the injured party whole." *Eros Ent., Inc. v. Melody Spot, LLC*, 99-cv-1157, 2005 WL 4655385, at *5 (E.D.N.Y. Oct. 11, 2005).

On September 1, 2020, this Court entered an order on preliminary injunction, enjoining Defendants from, among other things, "infringing any copyrighted photographs that are owned or exclusively controlled by any of Plaintiffs . . . infringing any trademark that is owned or exclusively controlled by Plaintiffs . . . [u]sing false designation of origin, false statements, and/or deceptive conduct that cause confusion and deceive consumers about the origin, sponsorship, or association of Defendants' products." Order Preliminary Injunction, ECF No. 54. The order is

clear and unambiguous. *See Upjohn Co. v. Medtron Lab'ys, Inc.*, 894 F. Supp. 126, 133 (S.D.N.Y. 1995) (finding preliminary injunction unambiguous where it "expressly enjoined defendants from manufacturing, selling or otherwise distributing the infringing product" and "prevented defendants from the continued infringement, including the manufacturing, sale, distribution, advertisement, and promotion, of [Plaintiffs' products]") (quotation omitted)).

Defendants have failed to comply with this order. First, on September 29, 2020, Plaintiffs discovered a series of Instagram posts from an account belonging to Defendants which infringed on Plaintiffs' copyrighted works and marks. Hines Let., ECF No. 76. Infringing material continued to appear on various internet platforms controlled by Defendants until December 23, 2020. *Id.* On January 21, 2021, this Court ordered Defendants to submit a sworn declaration that they "have used their best efforts to find and remove from internet and social media sites over which they have control all material subject to the preliminary injunction." Order, ECF No. 81. On February 5, 2021, Mizrahi submitted a sworn declaration to this effect. ECF No. 87.

Over a year after Mizrahi's sworn declaration, a Meylah.com page controlled by Defendants used Plaintiffs' copyrights and marks to sell infringing goods. Hines Decl. Exs. 13, 43. The Meylah.com page infringed on every one of the Hudson Unregistered Marks. *Id.* At his deposition, Mizrahi admitted that he fully controlled the content of the page. *See* Mizrahi Dep. 162–168. Defendants' brief conspicuously fails to address these allegations. In fact, they make no argument regarding Plaintiffs' motion for civil sanctions. In light of the overwhelming evidence of Defendants' defiance of this Court's preliminary injunction, the Court finds that the proof of noncompliance is clear and convincing, and that Defendants have not diligently attempted to comply in a reasonable manner. Accordingly, civil contempt sanctions are warranted.

"As to the remedy for defendants' breaches, the Court's objective is to recompense [Plaintiffs] for the fees and costs that, but for these breaches, it would not have incurred." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 210 (S.D.N.Y. 2020). To that end, the Court orders Defendants to pay Plaintiffs' attorneys' fees and costs incurred in seeking compliance with the Court's preliminary injunction as a sanction for contempt.

## IV. Damages

### A. Copyright Infringement

#### 1. Defendants' Infringement was Willful

"After establishing liability for copyright infringement, the copyright owner may elect to recover either statutory damages or actual damages and profits." *Otto*, 345 F. Supp. 3d at 435. "Should the copyright owner choose to recover statutory damages, the burden falls on her to prove that the infringement is willful." *Id.* "If the Court determines that the plaintiff has met that burden, it may, in its discretion, enhance the statutory damages award up to $150,000 per infringed work." *Id.* "[C]onversely, 'where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." *BWP Media USA*, 196 F. Supp. 3d at 410 (quoting 17 U.S.C. § 504(c)(2)).

To determine whether infringement was willful, "[t]he standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the possibility." *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993). "The Second Circuit has explained that 'a court need not find that an infringer acted maliciously to find willful infringement.'" *BWP Media*, 196 F. Supp. at 411 (quoting

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986)). "In evaluating an infringer's state of mind, courts look to factors such as whether the infringer was on notice that the copyrighted work was protected, whether the infringer had received warnings of the infringements, as well as whether the infringer had experience with previous copyright ownership, prior lawsuits regarding similar practices, or work in an industry where copyright is prevalent." *Marshall v. Marshall*, 08-cv-1420, 2012 WL 1079550, at *25 (E.D.N.Y. Mar. 30, 2012) (citations omitted). Generally, "summary judgment is not a tool well suited to determining willfulness." *Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 117 (2d Cir. 2010). However, "it is permissible to do so where there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995).

There is ample evidence demonstrating Mizrahi's willful infringement of Hudson's copyrights. First, there is no dispute that Defendants knew they were using Plaintiffs' copyrighted photographs. *See* Defs.' SOF ¶¶ 35–36. Defendants contend that their use was fair, but this is unreasonable and does little to demonstrate they did not at least recklessly disregard the possibility they were infringing on Plaintiffs' rights. *See Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 328 (S.D.N.Y. 2003) ("Such an unreasonable belief, to the extent it existed, reduces to a mistake of law. Defendants . . . cannot escape a finding of willfulness by reliance on their erroneous views of a legal 'escape hatch' that does not exist and which itself rested on a reckless disregard for plaintiffs' clearly established legal rights.").

Further, Mizrahi is no stranger to copyright law. He has twice been sued for conduct mirroring the allegations here. *See Schonbek Worldwide Lighting Inc. v. Mizrahi*, 10-cv-1551, 2011 WL 13383439 (S.D.N.Y. Mar. 31, 2011); *Restoration Hardware, Inc. v. Lighting Design Wholesalers, Inc.*, 17-cv-5553, 2018 WL 11220835 (S.D.N.Y. Apr. 18, 2018). Notably, in

*Restoration Hardware*, on default judgment, the court awarded $1,300,000 in statutory damages for Mizrahi's willful copyright infringement. *Restoration Hardware, Inc.*, 2018 WL 11220835, at *5. These previous suits strongly indicate that Defendants were familiar with the law and willfully violated it. *See Walt Disney Co. v. Best*, 88-cv-1595, 1990 WL 144209, at *2 (S.D.N.Y. Sept. 26, 1990).

Defendants' willfulness can likewise be inferred from their conduct during these proceedings. In September of 2020 this Court granted a preliminary injunction in part enjoining Defendants' use of Plaintiffs' copyrights and trademarks. *Hudson Furniture*, 2020 WL 5202118, at *7. Despite this order, and a sworn declaration (dated February 5, 2021) by Mizrahi that he had "taken all steps necessary to find and remove any of Plaintiff's images which I control," ECF No. 87, Mizrahi continued to post Plaintiffs' copyrighted images on his online storefronts as recently as March 2022. Hines Decl. ¶¶ 61–64 (citing Mizrahi Dep. 162–165). Defendants knew they were infringing but continued anyway.

Accordingly, based on their acknowledgement that they used Plaintiffs' copyrights, their previous lawsuits regarding similar practices, and their continued recalcitrance in this case, no reasonable juror could conclude Defendants' infringement was anything but willful. Plaintiffs motion for summary judgment on the issue of willfulness is granted. Plaintiffs are thus entitled to recover enhanced statutory damages up to $150,000 per infringed work.

### 2. Effect of Registration

Before turning to the amount of statutory damages, the Court must first address whether Plaintiffs' copyrights were timely registered.

"To incentivize prompt copyright registration, the Copyright Act makes registration a condition precedent for recovering both statutory damages and attorneys' fees." *Graham v.*

*Prince*, 265 F. Supp. 3d 366, 389 (S.D.N.Y. 2017). Section 412 "precludes recovery of either statutory damages or attorneys' fees for 'any infringement of copyright commenced after first publication of the work and before the effective date of its registration.'" *Id.* (quoting 17 U.S.C. § 412(2)). In the context of an "ongoing series of infringing acts," infringement "commences" upon the "first act of infringement." *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158 (2d Cir. 2007). This provision is subject to a three-month grace period, which affords statutory damages "for all infringements of copyrights registered within three months after the first publication of the work." *Television Dig., Inc. v. U.S. Tel. Ass'n*, 841 F. Supp. 5, 11 (D.D.C. 1993) (citing 17 U.S.C. § 412).

Defendants argue that Plaintiffs have failed to identify when its alleged infringement "commenced" and can therefore not carry its burden to show entitlement to statutory damages. Defs.' Mem. 21–22. Plaintiffs contend that they discovered Defendants infringing use in June of 2020. They argue that because Defendants have not produced evidence of use before that date, June of 2020 should be the effective date that the infringement commenced. Pls.' Reply Mem. L. ("Pls.' Reply") 6, ECF No. 156.

As a threshold matter, the Court notes that Hudson's copyrights for the years 2012, 2014, and 2015 were all registered within three months of first publication and are therefore within the statutory grace period. Pls.' Reply 5. Thus, Plaintiffs' may recover statutory damages for the infringement of these copyrights. Hudson's copyright for its 2019 catalog is a different story. The 2019 catalog was published May 18, 2019, and registered nearly a year later, on May 15, 2020, well beyond the grace period. *Id.* Accordingly, when Defendants' infringement commenced is a material fact.

The Plaintiffs have not met their burden regarding the 2019 catalog. Plaintiffs' declarations show numerous occasions in which Defendants used its copyrights in 2018. *See* Hines Decl. Ex. 11, 27. Further, the Welch purchase, which occurred in March of 2019, was precipitated by Defendants' use of copyrighted images of the Valiant chandelier. Clearly the Defendants commenced infringing some of the Hudson copyrights before 2020. This does not prove that the infringement of the 2019 catalog commenced before its 2020 publication, but it certainly suggests it. To meet their burden, Plaintiffs must do more to show that Defendants infringement began after 2020. Merely offering the date they discovered the photos on Defendants' site is not sufficient. Accordingly, on the issue of statutory damages for the infringement of the 2019 catalog, Plaintiffs motion for summary judgment is denied.

### 3. Statutory Damages

The Court now addresses the amount of statutory damages it will award. Plaintiffs argue that the Defendants' conduct both before and during this action entitles them to maximum statutory damages of $150,000 per registration. The Court agrees.

District courts "enjoy wide discretion . . . in setting the amount of statutory damages." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) (quoting *Fitzgerald Pbl'g*, 807 F.2d at 1116). "When determining the amount of statutory damages to award for copyright infringement, courts consider: (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." *Id.* at 144. "Courts in this Circuit regularly use some multiple of a work's licensing fee when calculating statutory damage." *BWP Media USA*, 196 F. Supp. 3d at 410.

The Court notes that Plaintiffs have submitted no evidence regarding their actual damages. Nor have they provided the Court with a benchmark licensing fee to contextualize an award of statutory damages. This, however, does not doom their entitlement to maximum damages. *See Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 127 (2d Cir. 2014) ("Although revenue lost is one factor to consider, we have not held that there must be a direct correlation between statutory damages and actual damages. To suggest otherwise is to ignore the various other factors a court may consider and the purposes of statutory damages in the willful infringement context.").

Here, the Defendants have deliberately and repeatedly flouted their discovery obligations, making it impossible for Plaintiffs to accurately represent their damages. Moreover, Defendants have demonstrated that a harsh penalty is needed to deter future infringement. Not only have they all but ignored this Court's preliminary injunction, they have previously been assessed a $1,300,000 liability for copyright infringement but have persisted in the same scheme to use copyrighted materials to sell infringing goods. *Restoration Hardware, Inc.*, 2018 WL 11220835, at \*5. Given their intentional infringement of Plaintiffs' copyrights, lack of cooperation to provide relevant evidence, and the need to deter future infringement, the Court finds that maximum statutory damages are warranted in this case. *See Curet-Velazquez v. ACEMLA de Puerto Rico, Inc.*, 656 F.3d 47, 59 (1st Cir. 2011) (upholding maximum statutory damages where defendants' conduct made it "impossible for the court to determine the expenses saved or the profits reaped" due to defendants "inability to provide clear records for each company . . . making it impossible to re-create or track the information, data and revenues supplied in the defendants' reports").

Accordingly, the Court awards Plaintiffs $150,000 in statutory damages pursuant to 17 U.S.C. § 504 for the infringement of the 2012, 2014, and 2015 copyrights.

## B. Punitive Damages Under New York Civil Rights Law

-40-

Plaintiffs request that this Court hold that Baylar is entitled to punitive damages for the violation of his right to publicity under New York Civil Rights Law in an amount to be determined upon inquest. Pls.' Mem 24.

"Section 51 by its terms allows recovery of exemplary damages for knowing violations." *Bond v. Sterling, Inc.*, 997 F. Supp. 306, 311 (N.D.N.Y. 1998); *see also* N.Y. Civ. Rights Law § 51 (providing for exemplary damages "if the defendant shall have knowingly used such person's name, portrait, picture or voice in such manner as is forbidden or declared to be unlawful by section fifty of this article"). For exemplary damages to attach, no showing of malice is required. *Hernandez v. Wyeth Ayerst Lab'ys*, 738 N.Y.S.2d 336, 339 (N.Y. App. Div. 1st Dep't 2002) ("[N]o more need be shown than knowing use").

The Court holds that punitive damages are merited in this case. Defendants, without authorization, used Baylar's photograph and name on their websites in violation of section 50. Mizrahi's sworn declaration acknowledges that he knowingly posted Baylar's likeness. Mizrahi Decl. ¶ 14. Accordingly, the Court holds that Baylar is entitled to punitive damages for the violation of his right to publicity in an amount to be determined upon inquest.

## C. Attorneys' Fees and Costs

Both the Copyright Act and the Lanham Act authorize district courts to award attorneys' fees and costs to the "prevailing party" in a lawsuit. *See* 17 U.S.C. § 505; 15 U.S.C. § 1117(a); *Manhattan Rev. LLC v. Yun*, 919 F.3d 149, 152 (2d Cir. 2019). "The Lanham Act provides that a prevailing party shall be entitled to recover the 'costs of the action' and in 'exceptional cases' its 'reasonable attorney fees.'" *Experience Hendrix, LLC v. Pitsicalis*, 17-cv-1927, 2020 WL 3564485, at *14 (S.D.N.Y. July 1, 2020) (quoting 15 U.S.C. § 1117(a)). An exceptional case "is simply one that stands out from others with respect to substantive strength of a party's litigating

position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

An award of attorneys' fees is warranted here.  First, Plaintiffs are the prevailing party. Moreover, "Defendants willfully infringed [Plaintiffs'] intellectual property rights, and an award of attorneys' fees furthers the goals of the Lanham Act and Copyright Act, including deterrence of willful infringement." *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 427 (S.D.N.Y. 2018).  Further, Defendants have litigated this case in an "unreasonable manner" by flouting their discovery obligations and this Court's orders. *Sleepy's*, 909 F.3d at 530.  The amount of fees and costs shall be determined upon inquest.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** Plaintiffs' motion for copyright infringement (Count XI), finding Defendants liable for willful infringement of Plaintiffs' copyrights works, but denying summary judgment on damages related to Plaintiffs' 2019 catalog. In all other respects, Plaintiffs' motions for partial summary judgment (Counts VII–XII) and sanctions are **GRANTED.**

The Court further orders an inquest on damages regarding Plaintiffs' damages on its federal trademark and state law claims, including an award of compensatory damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, and attorneys' fees and costs, as permitted by law.  The inquest shall further cover the amount of attorneys' fees and costs related to Plaintiffs' trademark and copyright claims and for

sanctions and civil contempt.  Finally, the inquest shall cover Plaintiffs' request for permanent injunctive relief.

Plaintiff shall file Proposed Findings of Fact and Conclusions of Law concerning the above within four weeks of the issuance of this Opinion.  Defendants shall file with the Court its responses, if any, to Plaintiffs' submissions within four weeks thereafter.  The Clerk of the Court is directed to close the motion at ECF No. 132.


Dated: New York, New York                     SO ORDERED
      September 25, 2023

PAUL A. CROTTY
United States District Judge

-43-